Boston Edison Company vs. Department
of Public Utilities.

Suffolk. April 6, 1977. — April 19, 1978.

Present: Hennessey, C.J., Quirico, Braucher, Wilkins, & Abrams, JJ.

*Public Utilities,* Regulation, Rate base. *State Administrative Procedure
Act. Jurisdiction,* Public utilities. *Practice, Civil,* Review of order of
department of public utilities, Intervention. *Due Process of Law,*
Public utilities.

Scope of judicial review of orders issued by the Department of Public
Utilities in connection with rate setting proceedings. [9]

A rate of return of 13% on equity allowed an electric company by the
Department of Public Utilities was not confiscatory nor did the depart-
ment's adjustments to cost of service result in confiscation. [9-17]

In a rate setting proceeding the Department of Public Utilities did not err
in declining to employ a year-end figure in calculating rate base and in
using instead an adjusted year-average method. [18-19]

In a rate setting proceeding respecting an electric company, the com-
pany's failure to prove what portion, if any, of compensating balan-
ces, kept on deposit in various banks to ensure the availability of short-
term credit, was used and useful to ratepayers during the test year
warranted exclusion of the entire amount from the rate base by the
Department of Public Utilities. [19-20]

In a rate setting proceeding respecting an electric company, the Depart-
ment of Public Utilities did not err in excluding from the rate base the
unamortized portion of a retired pollution control device. [20-21]

In a rate setting proceeding respecting an electric company, the Depart-
ment of Public Utilities was warranted in excluding from the rate base
as "plant held for future use" a parcel of land and a plant that had
been retired in 1972 where the company introduced no plan for the use
of either. [21-22]

In a rate setting proceeding respecting an electric company, a decision of
the Department of Public Utilities to include in the rate base ninety

days of working capital to cover a lag in the collection of revenues associated with fuel costs, rather than 105 days as proposed by the company, was supported by substantial evidence. [22-23]

Where the Department of Public Utilities adjusted an electric company's test-year expense and rate base figures to reflect the addition of a new plant which was in operation for only half of the test year, it could properly make a corresponding revenue adjustment to reflect a projected increase in revenues after the test year even though there was no causal connection between the new plant and the increased revenues. [23-24]

In the circumstances, a decision of the Department of Public Utilities in a rate setting proceeding to increase test-year revenues to account for the addition of a new plant during the test year in the same proportion that test-year additions to rate base resulting from the new plant bore to total test-year additions to rate base was supported by the record, and such a method sufficiently offset the effects of attrition. [24-30]

In a rate setting proceeding, the Department of Public Utilities erred in refusing to adjust cost of service to reflect an increase in post-test-year property tax rates for the company's property located in Boston where the record before the department contained a reasoned estimate of the post-test-year Boston property tax increase and the record on appeal showed the actual amount of the increase; the department did not err, however, in rejecting an adjustment purporting to estimate tax increases in municipalities other than Boston where the record before the department did not contain a reasoned estimate of those increases and the record on appeal contained no information as to increases actually made. [30-31]

In a rate setting proceeding respecting an electric company, the Department of Public Utilities did not err in adjusting an expense figure for "refueling outage" at a nuclear power plant, which was based on the theory that, ideally, an outage should occur every twelve months, to reflect the fact that the company's actual practice had been to schedule such an outage only every sixteen months. [32]

In a rate setting proceeding the Department of Public Utilities erred in disallowing as a cost-of-service item the tax expense on the company's allowance for funds used during construction accrued from 1960 to 1973, where the taxes had not been normalized and were payable during the test year even though subsequent to 1973 the department had allowed the Company to begin normalizing taxes on the debt portion of the allowance. [32-34]

The fact that in a rate setting proceeding the Department of Public Utilities had included the full cost of a plant under construction in the rate base when the utility company had acquired an allowance for funds used during construction of this plant in the test year did not warrant the department's refusal in a subsequent proceeding to make an adjust-

ment in cost of service for taxes attributable to the allowance where such taxes had not been normalized and where the company had not accrued any allowance for construction of the plant after the rates set in the earlier proceeding went into effect. [34-35]

In a rate setting proceeding the Department of Public Utilities erred in disallowing as a cost-of-service item tax expense on the equity portion of the company's allowance for funds used during construction where the taxes had not been normalized and were payable during the test year. [35-38]

In a rate setting proceeding a decision of the Department of Public Utilities to calculate a utility company's income tax deduction for interest associated with short-term credit by calculating the interest on the year-average balance of short-term debt during the test year and to decline to adjust that figure for abnormal conditions was supported by substantial evidence. [38-39]

In a rate setting proceeding respecting a utility company, the Department of Public Utilities did not err in declining to adjust the test-year expense figures to allow the company a full year's depreciation on additions to plant in service made during the test year. [39]

In a rate setting proceeding before the Department of Public Utilities, an electric company was not entitled to a depreciation as part of its cost of service on easements acquired to construct transmission and distribution lines. [40]

The Department of Public Utilities erred in a rate setting proceeding respecting a utility company in disallowing as a cost of service item a contribution to an organization for the sole reason that the organization was no longer in existence. [40]

In a rate setting proceeding respecting a utility company, the Department of Public Utilities did not err in disallowing as a cost of service item a contribution to a lobbying organization [40-41]; nor did it err in disallowing as lobbying expenses an amount representing the difference between lobbying expense reported in a statement filed with the department and a higher figure previously reported to the Federal Power Commission [41].

In a rate setting proceeding respecting an electric company, evidence warranted a determination by the Department of Public Utilities that of $109,261 paid to the Massachusetts Electric and Gas Association, only $25,792 was paid for lobbying assistance. [41-42]

In a rate setting proceeding respecting a utility company, the Department of Public Utilities erred in allowing as an expense all but $17,194 of a total of $183,741 in salaries to employees who were paid in part for lobbying activities where there was no substantial evidence to support to the company's allocation of its employees' time. [42-43]

In a rate setting proceeding the Department of Public Utilities did not err in failing to deduct from cost of service the time spent by employees

of an electric company in learning about a public power referendum. [43]

In a rate setting proceeding, the Department of Public Utilities properly adjusted a utility company's test-year property tax expense by subtracting property taxes allocable to plant held for future use. [43]

The Department of Public Utilities acted within the scope of its powers under G. L. c. 164 in ordering an electric company affirmatively to demonstrate in any future rate case that its operations are efficient. [43-44]

The Department of Public Utilities did not abuse its discretion in permitting two individuals, each representing only himself, to intervene in a rate setting proceeding respecting an electric company, despite unusually extensive participation by one of the individuals. [44-46]

A decision of the Department of Public Utilities to exempt the first 384 KWH of monthly residential usage from a rate increase granted to an electric company was within the regulatory authority of the department under G. L. c. 164, § 94, was supported by substantial evidence, and did not violate the constitutional rights of the company's industrial customers. [46-48]

There was no merit to an electric company's claim that it was entitled to recover from the Commonwealth damages resulting from the length of time it took the Department of Public Utilities to implement rate increases. [49]


FIVE CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk, two on October 20, 1975, and one on November 6, 1975, August 25, 1976, and September 10, 1976, respectively.

The cases were reserved and reported by *Kaplan, J.*

*William G. Meserve & Edward B. Hanify* for Boston Edison Company.

*Laurence M. Johnson* for General Motors Corporation, intervener.

*Margot Botsford & S. Stephen Rosenfeld,* Assistant Attorneys General, for the Department of Public Utilities.

*Stanley U. Robinson, III*, intervener, pro se.

*John L. Matson, Walter P. Muther & Andrew J. Newman,* for Associated Industries of Massachusetts, Inc., amicus curiae, submitted a brief.

*Torgeir K. Kvale,* pro se, submitted a brief.

HENNESSEY, C.J. These are five consolidated appeals from final decisions, orders, and rulings of the Department of Public Utilities (Department) in two separate rate proceedings involving Boston Edison Company (Company). In the first proceeding, D.P.U. 18200/18200-A (hereafter 18200/18200-A), the Department granted a rate increase based on 1974 as the test year. In the second, D.P.U. 18515 (hereafter 18515), the Department granted an increase based on 1975 as the test year. The appeals were filed in the Supreme Judicial Court for the county of Suffolk (county court) under G.L. c. 25, § 5. A single justice ordered the appeals consolidated, and he reserved and reported them without decision to this court. He similarly reserved and reported the Company's motion for a stay, which the Company has renewed, and several motions to dismiss filed by the Department.

We consider first those issues relating to the more recent rate decision, 18515. In so doing, we dispose of two appeals — filed by the Company and by an intervener Stanley U. Robinson, III (Robinson), — alleging various claims of confiscation and challenging the propriety of various adjustments to the Company's rate base and cost-of-service calculations. We next consider the three appeals challenging the Department's earlier decision in 18200/18200-A. These appeals were filed by Boston Edison, Robinson, and General Motors Corporation (General Motors), an intervener in the proceedings below. Boston Edison and Robinson have limited their appeals in 18200/18200-A primarily to the issues also raised by General Motors, and these relate solely to rate structure. Specifically, the issues in 18200/18200-A concern the propriety of the Department's partially exempting certain residential customers from the rate increase. Finally, we consider two motions to dismiss, made in the county court, which were reported to us by the single justice.

On May 11, 1977, shortly after oral argument on these appeals the full court ordered interim relief for the Company by way of a $6,619,000 cost-of-service adjustment to

cover increased property taxes.[1] We find no error in the Department's decision in 18200/18200-A. We conclude that the Department's decision in 18515 was erroneous not only with respect to the property tax issue mentioned above but also with respect to certain lobbying expenses and the disallowed adjustment for "AFUDC not normalized." Some of these errors are in the Company's favor, and one goes in favor of the ratepayers.

We take notice of the Department's recent decision in D.P.U. 19300 (19300), granting Boston Edison additional rate relief based on 1976 figures. Although that decision moots a number of the issues involved in these appeals, we nevertheless reach the merits of all the issues before us. *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943). See *Potomac Elec. Power Co.* v. *Public Serv. Comm'n*, 380 A.2d 126, 149 n.33 (D.C. Ct. App. 1977). We do so because the parties have fully briefed the issues, and because the questions raised are likely to arise again in the reasonably near future, evading judicial review again at that time. See *Potomac Elec. Power Co.* v. *Public Serv. Comm'n, supra.*

The net amount of items allowed and disallowed on appeal exceeds the amount of interim relief granted, but we conclude that a prospective rate adjustment is now impossible, since new rates have superseded those set in 18515, and since a rate increase may not be awarded retroactively as matter of law. See *Newton* v. *Department of Pub. Utils.*, 367 Mass. 667, 679-680 (1975); *New England Tel. & Tel. Co.* v. *Public Utils. Comm'n*, 116 R.I. 356, 388 (1976). We further conclude that a refund to Boston Edison customers also is not in order at this time. See *id.*; *Fryer* v. *Department of Pub. Utils.*, 374 Mass. 685, 691 (1978). We remand the cases to the single justice for the entry of judgment.

---

[1] The merits of the property tax issue are discussed in the cost-of-service section of this opinion, *infra.*

## I. History of the Proceedings

On November 12, 1974, Boston Edison filed with the Department a proposed schedule of rates and charges designed to raise its 1975 revenues by about $70,000,000. The Department docketed this request as D.P.U. 18200 and held extensive public hearings. The Company had presented its direct case by May, 1975, but, because interested parties had intervened in the proceedings, it appeared that a final decision would be unlikely until September, 1975. The Company, therefore, filed a petition for interim rate relief requesting an immediate rate increase of $47,700,000, pending a final decision by the Department on its full request. The interim request was separately docketed as D.P.U. 18200-A but, on the Company's motion, the two proceedings were thereafter consolidated. The Department evaluated these rate proposals using calendar year 1974 as the test year, and on September 30, 1975, it issued a decision and order which, as subsequently amended, authorized new rate schedules designed to increase Boston Edison's annual revenues by $29,538,000. The appeals from that decision relate primarily to the problem of rate structure. The Department found that residential users as a class had not contributed significantly to the growth in peak load demand for electricity. Consequently, the Department exempted the first 384 kilowatt hours (KWH) of monthly residential usage from the general rate increase.

Two and one-half weeks after the Department's decision in 18200/18200-A, Boston Edison made a second rate filing seeking $49,500,000 in additional annual revenues. The Department docketed this case as D.P.U. 18515, and again numerous parties intervened in the proceedings. This time, using calendar year 1975 as the test year, the Department determined on August 12, 1976, that the Company was entitled to $10,960,000 in rate relief. The Company and intervener Robinson — who argues that the increase is too generous — challenge that decision on numerous grounds relating

to cost of service, rate base, and rate of return. The rate structure portion of 18515 is under advisement by the Department until the issues raised by the Company's request for increased revenues have been resolved.[2] In the meantime, the Department has permitted Boston Edison to collect a rate increase of $10,960,000 under the rate structure established in 18200/18200-A. Residential users remained exempt from the increase, to the extent of the first 384 KWH consumed each month, until the Department's superseding decision in 19300.

In connection with its motion for a stay in the county court, Boston Edison submitted two affidavits, one by Ralph M. Kelmon, the Company's treasurer (Kelmon affidavit), and the other by Robert D. Saunders, senior rate engineer in Boston Edison's rate research and forecasting department (Saunders affidavit). The Kelmon affidavit presented updated financial results for calendar year 1976 based on eight months' actual data and a four-month forecast. It also provided information with respect to the increase in the property tax rate in the city of Boston for the fiscal year that commenced on July 1, 1976. The Saunders affidavit presented updated information with respect to growth in 1976 sales over 1975 sales, also based on eight months' actual data and a four-month forecast.

When these consolidated appeals were reserved and reported by the single justice to the full court, the two affidavits were included in the record on appeal, but "without prejudice to the rights of the parties to argue to the Full Court . . . the question of whether or not said evidence is

---

[2] We see no need to remand 18515 for additional proceedings concerning rate structure. We take notice that in 19300, the Department has fashioned a rate structure apportioning the most recent rate increase among Boston Edison customers and that it has abandoned the concept of the 384 KWH exemption. No purpose would be served by further proceedings in 18515, since Boston Edison could not collect a rate increase now based on 1975 as the test year. However, if any of the parties feels that a remand would be appropriate, this court will entertain a motion to reconsider this aspect of the decision filed seasonably and promptly.

relevant, material, necessary, or otherwise properly includible in the record on appeal." No evidentiary objections were made at oral argument by any party, and we have admitted both affidavits in order "to bring the proof as nearly as reasonably possible down to the date of final decision." *Opinion of the Justices*, 328 Mass. 679, 687 (1952). *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 71-72 (1976); *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 448 (1971); *Boston Gas Co.* v. *Department of Pub. Utils.*, 359 Mass. 292, 300-301 (1971).

## II. Nature and Scope of Judicial Review.

Boston Edison alleges that the Department's decision in 18515 deprived the Company of the opportunity to earn a fair return on its investment. The Company contends, and properly so, that, to the extent that it asserts a claim of confiscation, it is entitled to an independent review as to both law and fact. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 70-71 (1976). *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 51, 54 (1975). *New Eng. Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 449 (1971). *Mystic Valley Gas Co.* v. *Department of Pub. Utils.*, 359 Mass. 420, 424 (1971). In so far as any of the challenged rulings do not independently or in cumulative effect give rise to a claim of confiscation, the standard of review is as set forth in the State Administrative Procedure Act. G. L. c. 30A, § 14 (7), as appearing in St. 1973, c. 1114, § 3. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils*, 371 Mass. 67, 71 (1976). *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 449 (1971).

## III. Claims of Confiscation.

Boston Edison advances two theories of confiscation. It first alleges that the rate of return allowed by the Depart-

ment in 18515 was unreasonably low, thereby depriving the Company of the opportunity to earn a fair return on its investment in violation of arts. 1, 10, and 12 of the Declaration of Rights of the Constitution of the Commonwealth and the Fourteenth Amendment to the Constitution of the United States. Clearly this allegation entitles the Company to independent review as to both law and fact. However, Boston Edison seeks to have the court employ this same degree of scrutiny in reviewing each of the many cost-of-service adjustments subsidiary to the Department's final decision in 18515. For this reason, apparently, the Company alleges a second theory of confiscation — "confiscation by adjustment." The Company contends that, even if the allowed rate of return was not confiscatory, the numerous adjustments to cost of service "ensured that the Company could never earn the return to which the Department found it was entitled." We do not consider whether these allegations even give rise to a claim of confiscation because we conclude instead that Boston Edison failed to meet its burden of proving confiscation on either theory.

Confiscation occurs when the Department's ratemaking decision deprives a utility of the opportunity to realize a fair and reasonable return on its investment. *Boston Gas Co. v. Department of Pub. Utils.*, 368 Mass. 780, 789-790 (1975). "A return is fair and reasonable if it covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.*, 371 Mass. 881, 884 (1977). See *Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944); *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923). Yet, it is not enough for a utility merely to allege confiscation in the hope that this court will disagree with the particulars of a complex decision and will supplant it with another more to the Company's liking. This court will not interfere with

the exercise of the ratemaking power unless confiscation is clearly established on the record before us. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 327 Mass. 81, 85-86 (1951); *St. Joseph Stock Yards Co.* v. *United States*, 298 U.S. 38, 53 (1936). Cf. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, *supra* at 885. In the instant case, we are not persuaded that Boston Edison will suffer confiscation.

As in previous rate proceedings, the Department adopted and applied the "cost of capital" method of determining the fair rate of return on the Company's rate base. No issue is now presented as to the cost of debt capital or as to the capital structure of the Company. The Company maintains, however, that the 13% return allowed on common stock seriously understated the Company's cost of equity capital and that, as a result, the composite rate of return allowed by the Department — 9.49% — was confiscatory or otherwise contrary to law.

There is no dispute that the return on equity capital must at least equal "'the amount which the company would have to pay in order to "hire" its equity capital under current conditions.'" *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 327 Mass. 81, 88 (1951). We have recognized, however, that fixing the fair rate of return is a matter of judgment, not a mechanical exercise. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 474 (1971). The rate of return is not an immutable number, but rather one chosen from a range of reasonable rates and determined by the Department to be appropriate under the circumstances. *Id.* The question before us as to equity capital is whether the 13% figure was above the line of confiscation. Having reviewed the record, we hold that the Department's cost of equity determination is not confiscatory or otherwise illegal.

Five witnesses testified as to the rate of return, and their estimates as to the cost of equity ranged from 11.2% to 15.5%. Each of these experts presented a sophisticated analysis that gave the outward appearance of objectivity,

but, on closer scrutiny, it is apparent that the method applied by each contained inconsistencies. Each provided an opinion which a reasonable mind might accept as adequate to support a conclusion, see G. L. c. 30A, § 1 (6), but each based his analysis on assumptions that were controversial in themselves. The Department did not base its decision on the testimony of any one witness. Rather, the Department's written decision evaluates the strengths and weaknesses of each witness's testimony, culling from the mass of evidence those elements which, we agree, are worthy of weight. In so doing, the Department based its cost of equity judgment on a reasoned composite of all the evidence. That is a process which this court has strongly encouraged. See *Wannacomet Water Co. v. Department of Pub. Utils.*, 346 Mass. 453, 465-471 (1963). Compare *Boston Gas Co. v. Department of Pub. Utils.*, 368 Mass. 780, 804 (1975), with *New England Tel. & Tel. Co. v. Department of Pub. Utils.*, 360 Mass 443, 474-475 (1971).

"[T]he return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks." *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944). See *Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.*, 371 Mass. 881, 884 (1977); *Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968). Clearly, the 13% return on equity satisfied this standard. The Company's witness Benore arrived at 15.5% as his estimate of the cost of equity by comparing the potential return on the Company's shares with the return on industrials shares generally. This comparison is of minimal value because of the dissimilarity of the risks facing public utilities and those facing industrials. See J. Bauer, Updating Public Utility Regulation: Assuring Fair Rates and Fair Returns 107 (1966); Note, An Earnings-Price Approach to Fair Rate of Return in Regulated Industries, 20 Stan. L. Rev. 287, 289 (1968). The dissimilarity between utility and industrials shares is further demonstrated by recent history, since, according to the Company's own evidence, the two

groups of securities have not been even roughly comparable since 1965.[3]

However, the record contains evidence allowing a comparison of Boston Edison's financial condition to that of fifteen other similarly situated public utilities. These figures were current at the time of the Department's decision, and they show that with a 13% return on equity, Boston Edison enjoyed returns commensurate with the returns earned by similar utilities.[4] The Company ranked at or near the bottom of the sample in several indicators of equity return[5] yet Boston Edison's stock yielded higher dividends than any other stock in the sample. More importantly, the Company's earnings per share were 10.54% of market price, using test year 1975 earnings and the year-end price. Equivalent figures for comparable utilities ranged from 8.84% to 15.24%, and Boston Edison's allowed yield of 13% was the sixth highest of the sixteen. The record as a whole does not sustain a claim of confiscation based on a comparison between Boston Edison and other public utilities.

In addition to being commensurate with the returns allowed comparable companies facing comparable risks, the

---

[3] From 1960 to 1965, common stock prices of utilities performed in line with industrials. Since then, the price of utility stocks generally has declined 55% while industrials have declined only 1%. During the same post-1965 period, earnings for industrials have increased 77% as compared to 25% for utilities.

[4] The rate of return allowed on common equity was also 13% in 18200/18200-A, the Company's last previous general rate proceeding, also the subject of this opinion.

[5] The Company's growth rate in units sold was the slowest of the sample. The Company also ranked last in ratio of market price to book value, and it ranked next to last in earnings as a percentage of book value. The Department discounted the significance of the market-to-book ratio except in so far as it related to a potential investor's evaluation of the comparative risk of investing in Boston Edison stock, a factor that is discussed *infra*.

The Company argues strenuously that its high debt-to-equity ratio makes an investment in Boston Edison stock uniquely risky. We note, however, that five out of the other fifteen utilities in the sample had higher debt-to-equity ratios.

return on equity "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944). See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 884 (1977). Boston Edison failed to establish confiscation measured by this standard, as well. A poll introduced by the Company indicated that one out of every eight financial institutions would be attracted, at a 13% return, to the common stock of a public utility whose A-rated bonds were selling to yield 10%. Boston Edison's bonds are one step lower than A-rated, but the strong improvement in money market conditions between the time these investors were polled and the time of the Department's decision in 18515 caused the Department to conclude that a 13% return on equity would be sufficient to attract capital and maintain investor confidence. We agree.

Although the Company's bonds are not A-rated, the record shows that at the time of the Department's decision, bonds of a grade comparable to those of the Company had recently sold to yield 11.75%. This evidence cuts both ways. It shows a reluctance on the part of some investors to buy Boston Edison bonds, while the Company's return on equity is 13%, unless they receive a greater return than 10%. Nevertheless, it also shows quite clearly that, with a 13% return on equity, there were enough investors in the market willing to buy Boston Edison bonds if the Company were to pay a return slightly higher than that on which investors polled had previously premised their vote of confidence. Moreover, the financial market in which the Company operates improved substantially over the course of the 18515 proceedings. The Attorney General argues persuasively that this trend continued up to the time of oral argument in this case. At the beginning of test year 1975, the prime interest rate was 10.25%; by the close of the 18515 proceedings in May, 1976, the rate had dropped to 6.75%. As the Company's senior vice president testified, this drop in the interest rate, together with the general improvement in the stock

market, has had a restorative effect on the value of the Company's stock: toward the end of 1974, the price of Boston Edison stock ranged from $15 to $17 a share; by the end of test year 1975, the price had risen to $22 a share; by the end of the 18515 proceedings, the stock was selling at $24.50 a share.[6] Clearly, there is an improving market for the Company's outstanding shares, and Boston Edison cannot claim confiscation based on lack of investor confidence.

The principal factor causing Boston Edison's witnesses to advocate a 15% return on equity was the Company's belief that the capital attraction standard of the *Hope Natural* case[7] requires the Department to allow a return on equity sufficient to maintain the market price of the Company's stock at a level slightly higher than the stock's book value. The Department concedes that the 13% return allowed in 18515 will not accomplish this result, and it also recognizes that, in a proper case, a market price lower than book value provides some evidence of confiscation. See, e.g., *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 76 (1976). The per se rule advocated by the Company finds no support in our cases, and we are not inclined to adopt it now. Experience has shown that, in making a determination as elusive as estimating the cost of equity capital, "mathematical formulas and rules of thumb are obsolete." 1 A.J.G. Priest, Principles of Public Utility Regulation 196 (1969).

The Company's principal argument here is that, if it issues new shares, their cost to the new buyers must equal the book value of existing stock in order to avoid "diluting" the equity of existing shareholders in the corporation. In order to accomplish this, the Company argues, the rate of return must be sufficient (1) to cover the cost of issuing the additional shares, (2) to absorb the drop in market price caused, apparently, by the temporary glut of Boston Edison shares,

---

[6] In 1977, the stock reached a high of $28.38.

[7] *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944).

· and (3) to then maintain a market price equal to the book value of shares previously outstanding. Boston Edison asserts that, in order to complete the massive construction program it has undertaken, the Company may decide to issue additional stock. It further asserts that, if it must issue stock at a price lower than book value, it will dilute the equity of existing shareholders and that, as a result, investors will not be attracted to Boston Edison stock at any price. The Company cites no case in which this has occurred, and we know of none.

The Department, of course, must set the rate of return high enough to preserve the financial integrity of the Company, but there was no showing in 18515 that the Company has been unable to attract capital in the past or that to issue common stock under present circumstances would jeopardize the Company's ability to attract capital in the future. The record contains speculation to that effect, but nothing more.[8] This is not a case in which the utility has a demonstrable inability to attract capital and where investors face a risk of continual dilution even as the utility finances its normal operations. In such a case, the utility might fairly allege that the dilution is attributable to State action, and this court has recognized that — as a prima facie matter, at least — "forced dilution is confiscation." *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 76 (1976). See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 477 (1971). In this case, however, Boston Edison's need for additional capital stems from a special project — a construction program of limited

---

[8] The Company argues that the derating of its first mortgage bonds and the disappointing performance of its common stock indicate a lack of investor confidence in the Company. But, because of similar problems throughout the electric industry, it is equally likely that these signs merely show investor disillusionment with these two classes of securities, regardless of their issuer. See Katzin, Electric Utility Financing Today, 55 Ore. L. Rev. 479 (1976). The record shows that Boston Edison has tried novel financing techniques successfully in recent years. This, too, seems to be an industry-wide experience. *Id.*

duration and unprecedented size. We cannot say as matter of law that the Constitution requires ratepayers to sustain the price of Boston Edison's stock above book value except to the extent absolutely necessary to maintain sufficient investor confidence to allow the business to continue as usual. Ultimately, it is investor confidence, not dilution considered by itself, that is the constitutionally significant criterion. "The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces." *Market St. Ry.* v. *Railroad Comm'n of Cal.*, 324 U.S. 548, 567 (1945). We are not persuaded that a market price lower than book value necessarily indicates a lack of opportunity to earn a fair return on equity. The record supports a conclusion to the contrary, namely, that investors are more interested in the return on the market price they pay than in the current book value of their stock.

We find that the 13% cost of equity figure set by the Department is above the line of confiscation. The Company also argues that the determination is unsupported by substantial evidence, but we find substantial evidence to support any cost of equity judgment between 11.2% and 15.5%. Robinson argues that the 13% figure is so high as to be confiscatory of the ratepayers, but we disagree. The figure set by the Department falls within the range of permissible judgment.

Boston Edison's failure to establish the indicia of confiscation is equally fatal to the claim that it has suffered "confiscation by adjustment." The Company's only argument addressing the merits of this second claim is that the Department arbitrarily increased the Company's test year revenues and decreased its test year expense figures. As will be seen in the cost-of-service discussion, *infra*, the Department's adjustments were not arbitrary and, with three exceptions which we address, the adjustments of which the Company complains were not unlawful.

IV. REVIEW UNDER G. L. c. 30A.

A. *Calculation of the Rate Base in 18515.*

A public utility's rate base is its total investment (less depreciation) in property that is used and useful to the public in providing utility service during the test year. E.g., *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 450 (1971). The rate base ultimately adopted by the Department in 18515 was $986,692,000, which is about $40,000,000 lower than the $1,027,006,000 rate base figure proposed by the Company. Boston Edison contends that, in computing the rate base, the Department committed the following errors: (1) it based its computation on the Company's average investment during the test year rather than on its total investment at year end; (2) it excluded from the rate base certain funds — known as "compensating balances" — kept on deposit in various banks to ensure the availability of short-term credit; (3) it excluded the unamortized portion of the Company's investment in certain pollution control equipment which can no longer be used economically and which was not used during the test year; (4) it excluded the Company's investment in land held for possible future use; and (5) it reduced the cash working capital allowance includable in the rate base by rejecting the use of a standard accounting convention and instead estimating the Company's future working capital needs from evidence of the Company's actual experience.

1. *Year average* vs. *Year end.* In its proposed calculation of rate base, Boston Edison used year-end 1975 figures, which it urged the Department to adopt in order to offset the effects of attrition and regulatory delay. The interveners, on the other hand, urged the Department to use the "year average" calculation — that is, the average of the year-end figures for 1974 and 1975. It has become the Department's established practice to use the year-average method, but in 18515 the Department departed from this method to include the full year-end value of the Mystic 7

station (Mystic 7), less depreciation, in the rate base. This adjustment gave Boston Edison approximately seven-eighths of the differential resulting from the two methods of calculation. The Company's protest on appeal is that the Department did not abandon its established practice altogether for the test-year 1975. There was no error.

The Department is not compelled to use any particular method for calculating the rate base, provided that the end result is not confiscatory — a matter in which the utility bears the burden of proof. *Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.*, 371 Mass. 881, 884 n.5 (1977). *New England Tel. & Tel. Co. v. Department of Pub. Utils.*, 371 Mass. 67, 71 (1976). *New England Tel. & Tel. Co. v. Department of Pub. Utils.*, 360 Mass. 443, 453 (1971). In this instance, the Department tailored the application of the year-average and year-end methods to yield a fair and principled result.[9]

2. *Compensating balances.* The Company's calculation of rate base included $22,592,000 in compensating balances kept on deposit in various banks to ensure the availability of short-term credit. The Department excluded this sum from the rate base in 18515. Boston Edison concedes that its loan agreements with these banks do not limit the Company's ability to withdraw these funds, but it stresses that, as a practical matter, it must maintain compensating balances if it hopes to continue short-term borrowing.

The Department's objection is that the Company has not attempted to trace and measure what portion, if any, of the compensating balances are used and useful to the ratepayers. The record does not show the purposes for which

---

[9] The Company's reliance on *Southbridge Water Supply Co. v. Department of Pub. Utils.*, 368 Mass 300, 308-309 (1975), is misplaced. In that case we held that it was error of law for the Department to apply the year-average method under the special circumstances presented. In this case, the Department has not adhered strictly to the year-average method; on the contrary, it has afforded year-end treatment to Mystic 7, a station that was in service for the last six months of the test year. For a related discussion of the *Southbridge* case see note 13, *infra*.

the short-term credit is used; the Company has not broken down the $22,592,000 sum to apportion short-term credit between operating costs and capital costs, which are not includable in rate base. In such undifferentiated form, compensating balances do not reflect any measure of usefulness to customers asked to pay a rate of return on them. For this reason, the Department excluded the entire amount from the rate base, relying on our decision in *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 460 (1971).

There was no error. The same failure of proof has occurred here as occurred in that case. Moreover, the Company was put on notice by the Department's decision in 18200/18200-A that the need for compensating balances and the necessary amount thereof should be clearly established as part of a working capital lag study. In the absence of such evidence, it was not improper for the Department to exclude the Company's proposed rate base adjustment.

3. *Exclusion of the scrubber from rate base.* In 1970, Boston Edison invested $5,283,000 in a scrubber, a pollution control device designed to permit the use of inexpensive high sulphur fuel oil without increasing air pollution. The Company built the scrubber as an experiment which, if successful, might have saved ratepayers a substantial amount in fuel clause charges. Tests showed that the scrubbing process did indeed work, but the scrubber has been permanently retired because changes in Federal air quality regulations have made operating the device economically unfeasible.

The Department has permitted the Company to recover the entire amount of its investment from the ratepayers. For this reason the Department has allowed the Company to amortize the investment over a ten-year period; one-tenth of the investment will be reflected in the rates, as part of the cost of providing electrical service, each year for ten years. But the Department will not permit the Company to earn a return on the unamortized portion of the investment in the meantime. For this reason, the Department excluded the

unamortized portion from the rate base in 18515. There was no error. The record shows that the scrubber was not used or useful to the ratepayers during the test year and would not be put back in operation in the future. This court has sanctioned the Department's general policy of excluding retired plant from the rate base provided that the Department applies its policy consistently to the affected utility and provided that the exclusion does not have a confiscatory effect. See *Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.*, 371 Mass. 881, 886 (1977). Special circumstances may necessitate an exception to the Department's policy on occasion, see *Boston Gas Co. v. Department of Pub. Utils.*, 367 Mass. 92, 101-102 (1975), but no special circumstances appear in this case.

4. *Plant held for future use.* The Company included $1,895,691 in its proposed year-end rate base as "plant held for future use." Of this amount, $1,663,000 was allocated for land, and $232,691 for plant that had been retired in 1972. The Company introduced no plan for the use of either. There was no error in excluding the two items from the rate base.

When the Company anticipates a need for constructing a new plant, it buys land in the area under consideration, often well before the time when the land will actually be used in construction. The Company contends that, in the long run, a program of this sort might reduce the Company's total land acquisition costs. This may be true, but in the meantime the land is not used and useful in providing service to the ratepayers. Moreover, the Company remains free to sell the land at a profit, which goes to the stockholders, not to the ratepayers. One such sale occurred during the test year.

The Department's general policy is to exclude from the rate base items that are not currently used and useful to the ratepayers. E.g., *New England Tel. & Tel. Co.*, 11 P.U.R. 4th 297 (Mass. Dep't of Pub. Utils. 1975). This policy is in accord with that of many jurisdictions, see 1 A.J.G. Priest,

Principles of Public Utility Regulation 180 & n.138 (1969), and there was no reason to depart from it in this case.

5. *Cash working capital.* The cash working capital allowance in the rate base represents the amount of money the utility must supply from its own funds to meet operating expenses as they arise during the period between the rendition of service and the receipt of payment therefor. Ordinarily, the allowance equals 12.5% of those total annual operating expenses that require working capital. That is, the company should have enough cash on hand to cover forty-five days of operating expenses (12.5% of the year), on the assumption that there will be a lag of forty-five days between rendition of service and payment by the customer. The forty-five day figure is a widely used convention, but it is axiomatic that the regulatory agency "may quite reasonably and properly take into account factors which reduce the need as well as those which increase it." *Alabama-Tenn. Natural Gas Co.* v. *Federal Power Comm'n*, 203 F.2d 494, 498 (3d Cir. 1953).

Using the forty-five day standard, the Company included $30,457,000 in its proposed rate base as cash working capital. It included another $28,917,000 to cover an additional sixty-day lag in the collection of revenues associated with fuel expenses. The interveners objected that if the Department allowed both items in the rate base, it would in effect be allowing the Company a return on 105 days of working capital purportedly needed to cover fuel expenses.[10] The Company's witness had admitted on cross-examination, however, that there was a ninety-day lag for fuel costs, not a 105-day lag.

The Department, therefore, rejected Boston Edison's proposals and recalculated the Company's working capital needs according to the evidence. It allowed ninety days of working capital to cover fuel costs; sixty days of working

---

[10] Forty-five days' working capital for operating expenses plus sixty days' additional cash to cover additional fuel costs equals 105 days' working capital.

capital to cover purchased power costs; and the usual forty-five days of working capital to cover all other operating expenses. The recalculation lowered the Company's proposed working capital allowance by $4.6 million. The Department's decision was supported by substantial evidence.

B. *Cost-of-Service Adjustments in 18515.*

The Department used the historic test-year approach in determining the Company's revenue needs. After calculating the adjusted average rate base for 1975, the Department considered the actual revenues and expenses for that year in order to determine the cost of service. It then made such adjustments as it deemed necessary to arrive at a proper basis for determining the revenues needed by the Company to enable it to earn a fair return on the rate base. Boston Edison maintains that in this process the Department overstated its test-year base revenues and understated its expenses, thereby depriving the Company of revenue to which it was entitled.

Specifically, Boston Edison argues first that the Department distorted the base revenue figure by adjusting the Company's calculation to include additional future revenues projected to be earned from Mystic 7, which had been included in the rate base on a year-end basis. The Company also contends that in computing its test-year expenses, the Department committed the following errors: (1) it disallowed an adjustment based on an estimated property tax increase; (2) it understated the average annual cost of refueling the Company's nuclear power plant; (3) it disallowed the Company's proposed tax adjustment for depreciation on "AFUDC not normalized";[11] (4) it understated the Company's income tax expense by overstating the amount of the Company's interest deduction associated with short-term credit; (5) it failed to annualize depreciation on certain additions to plant in service; (6) it disallowed depreciation on easements; (7) it disallowed certain lobbying and political

---

[11] See subsection 4, *infra.*

expenses; and (8) it miscalculated property taxes on land held for possible future use. These alleged errors are discussed in the following paragraphs.

1. *The revenue adjustment.* The largest cost-of-service adjustment challenged by the Company concerns the Mystic 7 station. This is a 600-megawatt fossil-fueled generating plant that was put in operation in June, 1975 — thereby adding about 13% to the Company's plant in service. Although the station was in operation for only half of the test year, it would be in operation for the whole time that new rates would be in effect. For this reason, the addition of Mystic 7 greatly complicated the Department's task in 18515.

The essence of the test-year method is the correlation of revenues, expenses and assets (rate base) over a selected period of time. See, e.g., *Potomac Elec. Power Co.* v. *Public Serv. Comm'n,* 380 A.2d 126, 133 (D.C. Ct. App. 1977). The method has been likened to freezing the action of a motion picture in order to examine a single frame in detail. Note, An Earnings-Price Approach to Fair Rate of Return in Regulated Industries, 20 Stan. L. Rev. 287 (1968). The Department examines a test period — usually the most recent twelve-month period for which complete financial information exists — on the theory that the revenue, expense, and rate base figures during that period accurately reflect the utility's present financial situation and fairly predict the Company's future performance. See *Potomac Elec. Power Co.* v. *Public Serv. Comm'n, supra.* To the extent that known or anticipated changes in revenues, expenses, or rate base will distort the correlation among these elements, adjustments are made in the test-year data to reflect those changes. The approach depends on keeping the three elements in phase, however, and if an out-of-period adjustment is made to one, corresponding adjustments to the others may be necessary to preserve a fair relationship. See, e.g., *Los Angeles* v. *Public Utils. Comm'n,* 7 Cal. 3d 331, 336 (1972); *Pacific Tel & Tel. Co.* v. *Public Utils. Comm'n,* 62 Cal. 2d 634, 644-645 (1965); *State ex rel. Utils. Comm'n*

v. *Morgan*, 278 N.C. 235, 237-238 (1971).[12] The Department's decision in 18515 stretched this principle almost to the breaking point.

All parties agreed that the test-year figures would have to be adjusted substantially in 18515 to account for the addition of Mystic 7 to the Company's net plant in service. Boston Edison proposed expense and rate base adjustments, and the Department accepted these proposals. The Department also made a revenue adjustment, however, adding about $11,200,000 of the projected increase in 1976 revenues to the 1975 base revenue figure. It did so on the theory that this increase was attributable to Mystic 7.

Boston Edison challenges the propriety of this action on appeal, and in the alternative, it challenges the size of the adjustment. The Company's position has considerable merit. The Department's action was extraordinary, and, if it were not for the magnitude of the related adjustments in this case, we would likely find that it was unsupportable. Cf. *City of New York* v. *Public Serv. Comm'n of N.Y.*, 42 App. Div. 2d 259 (N.Y. 1973). However, the Department carefully tailored its usual approach to suit the special circumstances of a difficult case. On balance, we conclude that its judgment was supported by substantial evidence and did not amount to error of law.

The Department had added the Company's full year-end investment in Mystic 7 to the rate base. The effect of this year-end treatment was to allow a return on about $72,500,000 of property that would have been excluded

---

[12] See also *Michigan Bell Tel. Co.*, 85 P.U.R.3d 467, 470-471 (Mich. Pub. Serv. Comm'n 1970); *West Keansburg Water Co.*, 83 P.U.R.3d 423, 427-428 (N.J. Bd. of Pub. Util. Comm'rs 1970); *New York State Elec. & Gas Corp.*, 88 P.U.R.3d 300, 306 (N.Y. Pub. Serv. Comm'n 1971); *Rochester Gas & Elec. Corp.* 88 P.U.R.3d 271, 275-276 (N.Y. Pub. Serv. Comm'n 1971); *North Carolina Gas Serv. Div. of Pa. & S. Gas Co.*, 41 P.U.R.3d 91, 101-102 (N.C. Utils. Comm'n 1961); *United Inter-Mountain Tel. Co.*, 79 P.U.R.3d 499, 529 (Tenn. Pub. Serv. Comm'n 1969); *General Tel. Co. of Wis.*, 34 P.U.R.3d 497, 506 (Wis. Pub. Serv. Comm'n 1960); *Cheyenne Light, Fuel & Power Co.*, 79 P.U.R.3d 80, 86-88 (Wyo. Pub. Serv. Comm'n 1969).

from the year-average rate base altogether if the Department had not made an exception to its usual practice. It must be emphasized that year-average calculation of the rate base has been the Department's rule, and year-end treatment, even for additions to plant during the test year, has been a rare exception in Massachusetts. The Department's discretionary decision to apply the year-end approach to Mystic 7 redounded greatly to the Company's benefit. This benefit was one of the premises on which the Department based its forward-looking revenue adjustment.[13]

Moreover, the Department made discretionary increases in test-year expense figures, thereby increasing the asserted revenue deficiency. The Department allowed the Company's adjustments for annualized depreciation, projected wages, and property taxes associated with Mystic 7, adding these out-of-period expenses to the test-year cost of service. The latter two expense adjustments have been allowed in the past without a corresponding revenue adjustment, see *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 74-75 (1976); *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 481-482 and 490-491 (1971), but the annualization of depreciation on plant added during the test year is an unusual adjustment for the Department to allow. Like the year-end treatment for Mystic 7, this adjustment must be viewed in context; it was yet another element of a larger, singular exercise of reg-

---

[13] A somewhat persuasive argument can be made, on the authority of the *Southbridge* case, that year-end treatment for Mystic 7 was not discretionary, but required by law. See *Southbridge Water Supply Co.* v. *Department of Pub. Utils.*, 368 Mass. 300, 308-309 (1975). In *Southbridge*, the utility had taken a new reservoir into its rate base on the last day of the test year, thereby increasing its net plant in service by more than 60%. *Id.* at 304. This court held that it was error of law for the Department to require year-average calculation in the special circumstances presented. *Id.* Clearly, the rule in *Southbridge* was relevant to this case, but *Southbridge* is distinguishable, and, although the question is a close one, we do not think it would be appropriately applied here, where Mystic 7 was in use for six months during the test year.

ulatory discretion, namely the adjustment of test-year data to reflect a fair and accurate relationship among the rate base, revenues, and expenses.

Boston Edison argues that there is no causal relationship between the addition of Mystic 7 in 1975 and the increased base revenues in 1976. Therefore, the Company argues, it is arbitrary and capricious to attribute any portion of the increase in retail revenues to the addition of Mystic 7.

We need not disagree with the Company's premise in order to reject its conclusion. Clearly, the addition of Mystic 7 did not cause retail customers to consume more electricity, and so it did not *cause* the base revenue figure to rise in 1976. However, the Company's argument overlooks the reason for making any adjustment to test-year data at all, namely to make the rates accurately reflect the relationship between rate base, revenues, and expenses while the rates are in effect.

An accurate relationship among these three elements might have been established if the Department had used a purely year-average rate base with virtually unadjusted test-year figures. Alternatively, the relationship might have been established by using a purely year-end rate base with forward-looking adjustments to the whole gamut of revenues and expenses. In this case, the Department determined that neither method would be appropriate by itself. The Department essentially used the former method to strike a balance among these three elements in 18515, except that it used the latter method with regard to Mystic 7. As to Mystic 7, the Department used (1) a year-end rate base; (2) a full year of Mystic 7 operating expenses (as will be seen *infra*), increased to reflect all the out-of-period expense adjustments requested by the Company in this context; and (3) an out-of-period base revenue adjustment designed to make the rates reflect (a) the fact that Boston Edison had built Mystic 7 to meet a projected demand and to turn that demand into revenue, and (b) the fact that the Company would enjoy this increased revenue at a time when the rates set in 18515 would be in effect. It is not necessary,

therefore, to prove a causal relationship in order to conclude that an adjustment of the base revenue figure was appropriate under the circumstances and attributable to Mystic 7.

The fact which we find most persuasive, however, is that in 18200/18200-A the Company had conceded the need for a similar revenue adjustment and had itself proposed the figure adopted by the Department in that case.[14] In light of the Department's substantial additions to the rate base and expense figures, we cannot say that it was erroneous for the Department to make some corresponding revenue adjustment in 18515. See *West Keansburg Water Co.*, 83 P.U.R.3d 423, 427-438 (N.J. Bd. of Pub. Util. Comm'rs 1970).[15]

The Company next challenges the amount of the adjustment. The adjustment proposed by the Company in 18200/18200-A was $6,379,000 — 100% of Boston Edison's projected increase in base revenues from 1974 to 1975. In 18515, the interveners again proposed an adjustment equal to 100% of the projected revenue increase; their proposed adjustment was $16.7 million. The Department reasoned that — unlike in 18200/18200-A, in which Mystic 7 was not on line during any part of the test year — it would not be fair to add the entire projected increase to test-year revenues, since some of those revenues would be attributable not to Mystic 7, but to the remainder of the rate base, calcu-

---

[14] Since this factor in all probability will not be present in future cases, we give notice to the Department that if this issue should arise again, a similar adjustment may necessitate even closer judicial scrutiny.

[15] It can be argued that the Department erred in failing to articulate fully in its written opinion the reasoning underlying the revenue adjustment. See G. L. c. 30A, § 11 (8). We find the Department's stated reasons to be scanty indeed, but conclude that a fuller statement of the Department's reasoning should be excused under the special circumstances presented here. The Department originally made an out-of-period base revenue adjustment in 18200/18200-A because Boston Edison had conceded the need for such an adjustment. In 18515, the Department merely followed its own precedent set in 18200/ 18200-A. The Company clearly knew the reasons for the adjustment — both from the decision in the earlier case and from the controversy which the proposed revenue adjustment caused in the proceedings before the Department in 18515.

lated according to the usual year-average method. The De-
partment therefore determined that "[a] reasonable way to
adjust revenues to mesh with the Mystic 7 increase in rate
base is to attribute the expected revenue additions to Mystic
7 in the same proportion that the Mystic 7 test year addi-
tions to rate base (about $145 million) bear to total test year
additions to rate base (about $216 million). The result of
this is to add some $11.2 million to test year reven-
ues."[16] The adjustment made by the Department repre-
sented 67.1% of the projected revenue increase — as op-
posed to the 100% adjustment urged by the interveners and
0% urged by Boston Edison.

The Company argues that it is unfair to include a full
year's revenue increase attributable to Mystic 7 without
having the data also reflect a full year's expenses attributa-
ble to that plant. However, as the Company's treasurer
noted in 18200, the three plants Mystic 7 replaced —
Mystics 1, 2 and 3 — operated until June, 1975, and the op-
eration expenses attributable to these units were replaced by
equivalent expenses associated with Mystic 7. The unadjust-
ed test-year data included six months' expenses for Mystics
1, 2 and 3 and six months' expenses for Mystic 7. In effect,
therefore, the Department's decision in 18515 reflects a full
year of Mystic 7's expenses. The Company itself asserted this
equivalency in 18200.

The Company argued for the first time on appeal that an-
other reasonable way to calculate the adjustment would
have been to attribute the projected growth in 1976 retail
revenues to the total amount of plant in service, not just to
the Company's net additions during the test year. This
method would have resulted in a revenue adjustment of
only $2,505,000.[17] The Company was free to suggest this

---

[16] $\dfrac{\$145 \text{ Million}}{\$216 \text{ Million}} = 67.1\%; 67.1\%$ of $16.7 million = $11.2 million.

[17] The investment in Mystic 7 ($145,000,000) divided by total net plant
in service ($960,412,000) equals 15%. Fifteen per cent of the projected
revenue increase ($16,700,000) equals $2,505,000.

alternative below, but it never did so. Despite its conces-
sions in 18200/18200-A, and although the interveners pressed
for an identical method of adjustment in 18515, the Com-
pany failed to present an alternative formula to the Depart-
ment, choosing to argue instead that no revenue adjustment
at all should be necessary. The proposal urged by the Com-
pany on appeal was not before the Department, and, given
the unusual circumstances in this case, we cannot say that
the Department erred in choosing a higher figure that was
supported by reason and by the record.

Boston Edison's final argument with regard to the reve-
nue adjustment is that it partially deprived the Company of
the opportunity to use its normal growth in revenues to off-
set the effects of attrition. Attrition is "the tendency of the
rate of return to diminish in a period of comparatively high
construction costs." New England Tel. & Tel. Co. v.
Department of Pub. Utils., 331 Mass. 604, 622 (1954). In
1973, 1974, 1975 and 1976, the Company's actual rate of re-
turn has been lower than that allowed by the Department,
and we have held that the Department has a responsibility
to take evidence of attrition into account, by some method,
in order "to arrive at rates which afford the Company the
opportunity to earn a "fair and reasonable return on honest-
ly and prudently invested capital.'" New England Tel. &
Tel. Co. v. Department of Pub. Utils., 371 Mass. 67, 73
(1976), quoting from Boston Gas Co. v. Department of Pub.
Utils., 367 Mass. 92, 97 (1975). The Department took attri-
tion into consideration in this case by affording year-end
rate base treatment to Mystic 7. It was entitled to conclude
that this would be a sufficient remedy, and there is nothing
in the record to suggest a conclusion to the contrary.

2. *Estimated increase in property taxes.* In its proposed
cost-of-service calculation, Boston Edison included adjust-
ments to reflect the projected increase in 1976 property tax
rates for Boston and for various other municipalities in
which the Company's property is located. The Department
denied these adjustments, and its sole rationale was that
"[i]t is proper to annualize a known increase in property

taxes, but not an estimated one." This reasoning is inconsistent with the Department's own precedents and also with the decisions of this court. See *New England Tel. & Tel. Co. v. Department of Pub. Utils.*, 360 Mass. 443, 481-482 (1971); *Boston Gas Co.*, D.P.U. No. 17885-A, at 3 (Mass. Dep't of Pub. Utils., May 7, 1974); *Western Mass. Elec. Co.*, D.P.U. No. 17604, at 12 (Mass. Dep't of Pub. Utils., May 1, 1974). These cases show that the Department has long followed a policy of adjusting test-year property taxes to reflect known post-test-year increases. The Department has also permitted adjustments reflecting estimated increases when the record shows that the estimate is likely to be correct, or in any event when the estimate appears to be reasonable.

The record before the Department in 18515 contained a reasoned estimate of the 1976 Boston property tax increase. But moreover, the Kelmon affidavit, included in the record on appeal, now shows the actual amount of that increase. It shows that $6,619,000 in increased property taxes is allocable to Boston Edison's retail electric operations,[18] and we have previously ordered interim relief for the Company in that amount. The interim order will become final when judgment is entered on these consolidated appeals in the county court.

There was no error, however, in the Department's rejection of an adjustment purporting to estimate property tax increases in municipalities other than Boston. The Department could conclude that the record in 18515 did not permit a reasonable estimate of those increases to be made, and the record on appeal does not contain further information on this issue. The Company's own prior rate proceedings before the Department show that, when a reasonable projection is not made, estimated increases may be disallowed. *Boston Edison Co.*, 6 P.U.R.4th 77, 80 (Mass. Dep't of Pub. Utils. 1974).

---

[18] Boston Edison also sells electricity at wholesale, and it sells steam to be used for heating. Part of the tax increase is borne by these customers, who are not affected by this decision.

3. *Refueling costs.* Periodically, Boston Edison must shut down its nuclear power station for a number of weeks in order to change the nuclear fuel and make repairs that cannot be made with the plant in operation. No such "refueling outage" occurred during the test year, but the Company nevertheless added $4,000,000 to its test-year expense figures on the theory that, ideally, an outage should occur every twelve months during the period in which new rates are in effect. The Department disallowed part of the adjustment, noting in its decision that the Company's actual practice has been to schedule an outage only about once every sixteen months. This schedule was projected to continue in the future. Although the Company hopes to adopt a twelve-month schedule eventually, it did not show when this is likely to happen. The Department allowed a $3,100,000 adjustment, the annual cost of a refueling outage that occurs only about every sixteen months. There was no error.

The Company mentions two additional arguments in passing, contending that the Department miscalculated in reducing the Company's proposed refueling outage adjustment. There is no merit in either argument. To allow an additional $800,000 — as the Company first suggests — would be to attribute to the test-year cost of service a maintenance expense for which Boston Edison had already received reimbursement under the terms of a warranty settlement reached with the General Electric Company. The second argument is that the Company should be entitled to relief because it inadvertently understated the cost of a refueling outage by $200,000. This argument comes too late; the Department's decision was fully supported by cost-of-service figures put in the record by Boston Edison.

4. *"AFUDC not normalized."* Boston Edison raises three issues in connection with its proposed "adjustment for AFUDC not normalized." The Company's adjustment would have increased the cost-of-service figure to reflect fully the income taxes paid during the year. We discuss each of the issues separately against a background that is neces-

sary as a preliminary matter. We conclude that this adjustment was erroneously disallowed by the Department.

a. *"AFUDC."* The Allowance for Funds Used During Construction (AFUDC) is a standard account used by utilities and regulators to identify, for ratemaking purposes, the capital costs associated with a particular construction project. See Uniform System of Accounts for Electric Companies par. 432 (Mass. D.P.U. rev. ed. 1961). Its function is to compensate the utility for capital costs incurred during construction — that is, incurred before the cost of the completed project has been added to the rate base. As the Company incurs capital costs relevant to this account, it also "accrues AFUDC" — that is, it becomes eligible to have these costs reflected in the rates at some time in the future. The Department does not allow the utility to recover AFUDC accruals at the time the capital expense is incurred. Instead, the Department requires the utility to add the total obligation thus accrued to the cost of the new plant when it is eventually added to the rate base. The utility then recovers the amount of the AFUDC accruals gradually over the service life of the plant in the form of depreciation recognized as an expense incurred in providing electrical service. See generally Litke, Allowance for Funds Used During Construction, Pub. Utils. Fortnightly at 19 (September 28, 1972).

The Department defines AFUDC as "the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate upon other funds when so used." Uniform System of Accounts for Electric Companies par. 432 (Mass. D.P.U. rev. ed. 1961). As this definition shows, AFUDC comprises two distinct parts: (1) a debt portion, which represents the interest expense on borrowed money, and (2) a so called "equity" portion, which represents an opportunity cost incurred when the utility finances construction with its own internally-generated funds, forgoing a more lucrative investment in something else. See Litke, *supra.* The equity portion is an imputed cost. It does not reflect an out-of-pocket expense, but the Department has consistently treated it as an element of the cost of serv-

ice.[19] See, e.g., *Boston Edison Co.*, 6 P.U.R.4th 77, 79 (1974).

When the finished plant goes into operation, the Company's cost of service reflects two distinguishable kinds of depreciation. First there is the kind of depreciation that returns the utility's investment in its physical plant and which is tax deductible. See I.R.C. § 167. Then there is AFUDC, a kind of "depreciation" that repays capital costs incurred in building the plant. AFUDC receipts reflected in the rates are *not* tax deductible. Therefore, in addition to bearing the capital cost of new construction, the ratepayers must pay the tax on income attributable to AFUDC. The determination of when the ratepayers should do so adds another aspect to the issues raised by Boston Edison.

b. *"Normalization."* Should the utility's rates recognize the Company's AFUDC tax liability in the year in which ratepayers become obligated to pay AFUDC or later, in the year in which the Company actually pays the tax? The former method is called "normalization," and accountants do not agree on whether normalization is advantageous to the ratepayers in the long run. It is certainly advantageous to the utilities. See generally 1 A.J.G. Priest, Principles of Public Utility Regulation 124-136 (1969).

When a utility incurs a construction-related capital cost and accrues AFUDC on its books, that transaction has no present income tax consequences, only tax consequences in later years. Nevertheless, when AFUDC is accrued, a determinable, future tax liability is created. Taxes are said to be

---

[19] The rationale underlying the accrual of equity AFUDC is that "the cost of capital is not measured by interest payments alone, but rather by all the economic costs of the entire financing arrangement. A part of these costs is borne by the equity investors who are willing to assume risks and without which financing by debt capital would not be possible." Litke, *supra* at 19. If the Company had its plant built by an independent contractor who turned the finished plant over to the utility on a "turn key" basis, the price to the utility would include a premium for the contractor's having put his own capital at risk. The equity portion of AFUDC similarly compensates the utility for putting internally generated funds at risk when it builds the plant itself.

"normalized" when ratepayers are charged not the actual income taxes paid during the test year, but a larger, hypothetical figure. This figure represents the taxes actually paid plus an amount equal to the future tax liability on AFUDC accrued during the test year. In other words, the ratepayers pay the tax in advance. According to one commentator, normalization is popular with utilities since it requires ratepayers to pay a tax allowance which, instead of being transmitted forthwith to the United States Treasury, is available to the Company as a fund of cost-free capital until the taxes associated with AFUDC become due in later years.[20] See J.C. Bonbright, Principles of Public Utility Rates 220 (1961) (discussing normalization in connection with accelerated depreciation). For the purposes of this appeal, the importance of normalization is this: if AFUDC has been normalized, then the ratepayers have already paid the taxes; if AFUDC has not been normalized, then the rates must provide sufficient revenues to pay the taxes as they become due — in addition to paying back the capital costs incurred during construction.

c. *The three components of Boston Edison's "allowance for AFUDC not normalized."* We now turn to the issues raised by Boston Edison's appeal in 18515.

1) *Taxes, on AFUDC accrued from 1960 to 1973, which are now due and have not been normalized.* Boston Edison began accruing AFUDC in 1960. It did not begin normalizing taxes on the debt portion until the Department allowed it to do so in D.P.U. 17795-A, a rate proceeding employing a 1973 test year. *Boston Edison Co.,* 6 P.U.R.4th 77, 79 (1974). The Department has never allowed Boston Edison to normalize taxes on the equity portion of AFUDC.

Projects that were under construction between 1960 and 1973 are now in service. Boston Edison customers, there-

---

[20] It should be pointed out that the deferred tax reserves generated by normalization are subtracted from the rate base. Therefore, although the Company obtains the use of this money without incurring any additional cost, the Company is not entitled to earn a return on the fund at the expense of the ratepayers.

fore, are now paying AFUDC each year, and the Company
is incurring a corresponding income tax expense each year.
There is no deferred-tax reserve to meet this expense, be-
cause this AFUDC has never been normalized. In 18515,
the Department disallowed an adjustment that would have
recognized the tax expense in calculating the test-year cost
of service. Its decision was erroneous as matter of law.

The Department reasoned that "it is an inordinate bur-
den on current ratepayers to require them to support pres-
ent normalization as well as pre-normalization costs [that is,
present taxes]. Therefore, notwithstanding the fact that the
tax liability for pre-normalization AFUDC may in fact have
arrived, we do not think it should be charged to the Com-
pany's present customers . . . ." This reasoning misses the
mark. Tax expense is clearly an element of the Company's
cost of service, whether or not the Company accumulates a
deferred-tax reserve. Normalization determines only when
the tax will be reflected in the rates. It does not relieve cur-
rent ratepayers of an expense that is properly part of the cost
of service. This is so with regard to taxes on both the debt
and the equity portions of AFUDC.

2) *Taxes, on AFUDC accrued on Mystic 7 in 1974-1975,
that have not been normalized.* Under the Department's
policies, a utility may accrue AFUDC whenever it incurs
capital costs associated with a particular construction proj-
ect and may do so until the project is completed. Mystic 7
went into operation in June, 1975. The Company incurred
construction related capital costs up until that time. It was
therefore entitled to accrue, and did accrue, AFUDC in the
same amount.

None of the AFUDC accrued on Mystic 7 in 1974 and the
first six months of 1975 has been normalized. The Depart-
ment has never allowed equity AFUDC associated with *any*
project to be normalized. Moreover, although the Depart-
ment's rule now is to permit normalization of debt AFUDC,
it made exceptions with regard to debt AFUDC accrued on

Mystic 7 during 1974[21] and the first six months of 1975.[22] The Department's reasons for making those exceptions are not germane to this appeal. What is important is that the taxes have not been paid previously, and they are now falling due, a bit each year. The Company proposed an adjustment that would have included in the cost-of-service taxes on AFUDC payable during the test year. For the reasons discussed in part 1 of this discussion, *supra*, the disallowance of this adjustment was error of law.

The Attorney General argues that to allow this adjustment would be to allow double recovery in this case, since the full original cost of Mystic 7 was included in the rate base both in 18200/18200-A and in 18515. There is no possibility of double recovery here. Boston Edison actually accrued AFUDC in 1974 and 1975, and there can be no denying it. When the Company instituted rate proceedings in 18200/18200-A, the Department used 1974 as the test year and attributed Mystic 7 to the test-year rate base in order to set fair rates for the future. Those rates took effect on October 1, 1975. Therefore, the ratepayers have been paying a return on Mystic 7 as an item in the rate base since October, 1975. The Company accrued AFUDC only up until June, 1975. There is no overlapping and therefore no possibility of double recovery.

3) *Taxes on the equity portion of AFUDC — other than that associated with Mystic 7 — accrued from 1973 to 1975.* Taxes on the equity portion of AFUDC have never been normalized. The construction projects on which AFUDC was accrued are now in operation and providing electrical service to the ratepayers. The third component of Boston Edison's adjustment for "AFUDC not normalized" would have generated revenues to meet the taxes on the equity portion of all AFUDC — other than that relating to Mystic 7 — accrued since 1973, but not normalized. The preceding dis-

---

[21] This ruling came in 18200/18200-A, and the Department's decision to refuse normalization has not been appealed.

[22] This ruling came in 18515, and, again, the refusal is not before us.

cussion makes it clear that these taxes are properly includable in the test-year cost of service and that the Department erred in refusing the adjustment.

d. *The effect of mootness on this determination.* Taken together, the three components of the adjustment for "AFUDC not normalized" would have increased Boston Edison's test-year income tax expense by $2,360,000. Since we take notice that new rates have become effective since this appeal was filed, the Company may not now collect this amount retroactively in the form of a rate increase based on 1975 as the test year. The Company will nevertheless recapture most of its capital costs incurred during construction, since the Company will recover depreciation on the same AFUDC accruals here in issue for each year of the associated plant's useful life. In the future, the depreciation recovered by the Company will not be decreased by income tax expense.

5. *Income tax: Calculation of interest expense associated with short-term debt.* In order to calculate Boston Edison's test-year income tax expense for ratemaking purposes, the Department had to determine the amount of the Company's deduction for interest associated with short-term credit. Relying on evidence offered by the interveners, the Department calculated the interest on $106,000,000, the year-average balance of short-term debt during the test year. The Company objects that the amount of interest thus derived should have been reduced by two further adjustments which the Department refused to make. It argues that the Department erroneously failed to adjust the interest calculation by $4,903,000 to reflect a saving in short-term interest which the Company *would* have realized (1) if it had issued certain secured notes at the beginning of the test year rather than at the end, as actually happened, and (2) if it had also issued certain preference stock at the beginning of the year rather than toward the end of the first quarter. There was no error. It does not appear that the year-average figure required "adjustment for abnormal conditions." *Michigan Wis. Pipe Line Co.* v. *Federal Power Comm'n.*

263 F.2d 553, 556 (6th Cir. 1959). Cf. *United Gas Pub. Serv. Co.* v. *Texas*, 303 U.S. 123, 145 (1938). On the contrary, the Department could find that to use the Company's average short-term debt in calculating its test-year income taxes was an appropriate way to reflect the Company's usual short-term borrowing experience. The Company had issued secured notes and preference stock during the test year in order to refinance short-term debt, but the Department reasoned that it was incorrect to assume from this that the Company would enjoy a decrease in the level of short-term debt over the period in which new rates would be in force. The net effect of the Company's proposed adjustments would have been to assume a normal short-term debt level of only $72,000,000. The Department found, however, that "[t]hat figure is not a fair reflection of either the past or the future." Substantial evidence supported the figure chosen by the Department, and we cannot say that there was error of law.

6. *Annualized depreciation on test-year additions to plant in service.* The Department declined to adjust the test-year expense figures to allow the Company a full year's depreciation on additions — other than Mystic 7[23] — to plant in service made during the test year. The amount of the proposed adjustment was $735,000. The Department has determined to calculate the rate base on a year-average basis, and the Department could reasonably conclude that to allow the Company to annualize depreciation on plant not in existence at the beginning of the test year would have been inconsistent with that approach. See *Fall River Gas Co.*, D.P.U. No. 17708, at 9 (Mass. Dep't of Pub. Utils., Oct. 11, 1973). Cf. *Utah Tel. Co.* 81 P.U.R.3d 156, 160-161 (Utah Pub. Serv. Comm'n 1969). See generally *Kansas Power & Light Co.*, 8 P.U.R.4th 337, 362-363 (Kan. State Corp. Comm'n 1975).

---

[23] The Department allowed the Company to annualize its depreciation expense associated with Mystic 7. This adjustment has been discussed previously, *supra* at 26-27, in connection with the Mystic 7 revenue adjustment.

7. *Depreciation on easements.* As of December 31, 1975, Boston Edison had spent about $3,990,000 in acquiring easements in order to construct transmission and distribution lines. In 18515, the Company claimed depreciation on these easements, at the rate of 3%, as part of its cost of service. The Department rejected this $120,000 adjustment, reasoning that easements are interests in land which — unlike the power lines built on them — do not have a limited useful life. See *Western Mass. Elec. Co.*, D.P.U. No. 18252, at 12 (Mass. Dep't of Pub. Utils., Dec. 15, 1975). There was no error. The Department added the full original cost of the easements to the Company's rate base; that is, it did not subtract depreciation from the original cost as it would for other items on which the Company is entitled to a return. The result might well be different if the easements themselves were limited to a term of years, but that is not the Company's objection in this case.

8. *Lobbying and political expenses.* The Department disallowed about $43,000 in political contributions and lobbying expenses during the test year. The Company contends that this disallowance was erroneous. Robinson, on his part, claims error in the Department's failure to eliminate a great deal more of the Company's cost-of-service expenses, which he alleges were attributable to lobbying. We consider each appeal separately.

a. *Boston Edison's appeal.* Of the expenses disallowed, $10,000 represented a contribution to a group called Citizens for Economy in Government. That organization is no longer in existence, and for this reason alone the Department reduced the Company's cost-of-service figure by $10,000. Boston Edison maintains that this adjustment was arbitrary and capricious; the Department concedes the point in its brief. The Department's decision was erroneous as to this ruling.

Another $10,000 represented a contribution to the Massachusetts Taxpayers Foundation, a registered lobbyist whose principal activities, the record shows, are directed toward proposing and influencing legislation and executive

action. Boston Edison concedes that the recipient of its contribution is a lobbying organization, but contends that the Department erred in disallowing this expense because no evidence was offered to show that the Company's contribution was in fact used for lobbying. This argument has no merit. It is the Company's burden to show that each item of expense is properly part of the cost of service, and lobbying expenses are widely held to be excludable from a utility's operating expenses for ratemaking purposes. See, e.g., *Pacific Tel. & Tel. Co.* v. *Public Utils. Comm'n*, 62 Cal. 2d. 634, 669-670 (1965); *Illinois Bell Tel. Co.* v. *Illinois Commerce Comm'n*, 55 Ill. 2d 461, 479-480 (1973); *Central Me. Power Co.*, 15 P.U.R.4th 455, 475-476 (Me. Pub. Utils. Comm'n 1976).

The Company also objects to the disallowance of $22,658 in lobbying expenses in addition to the two contributions discussed above. There was no error as to this adjustment. The record in 18515 contains two reports detailing certain of Boston Edison's lobbying expenditures during the test year. A disclosure statement originally filed with the Federal Power Commission reported that the Company had incurred $75,103 in lobbying expenses to be borne by the stockholders. A second statement, filed with the Department, reported only $52,444 for such activities. The discrepancy is not explained in the record, and the Department chose to believe the higher figure. The Company offers an explanation for the first time on appeal; it is not persuasive, and, in any event, it comes too late.

b. *Robinson's appeal*. Robinson argues that three further items of expense allowed by the Department should have been disallowed as lobbying expenses.

During the test year, Boston Edison paid $109,261 to the Massachusetts Electric and Gas Association (MEGA), an organization that acts as a lobbyist, but also engages in a number of other activities on behalf of the Company. Boston Edison reported that only $25,792 of this amount was paid for lobbying assistance; the Department accepted this allocation, after cross-examination, and allowed the rest to be

reflected in the new rates. There is substantial evidence in the record to support the Department's determination.

Robinson further challenges the Department's refusal to disallow the salaries of certain Boston Edison employees who were paid by the Company to lobby on its behalf in addition to performing other public relations functions for the Company. Boston Edison had paid several "vice presidents for corporate relations" a total of $183,741 in salaries during the test year. The part of this expense which the Company reported as an excludable lobbying expense was $17,194. The Department accepted these figures despite the Company's inability to support the allocation on cross-examination. We conclude that there was no substantial evidence to support the allocation and that it was error of law for the Department to allow these expenses, absent proof that they are properly part of the cost of service.

Substantial evidence means "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 372 Mass. 678, 684 (1977). The Company's method of allocating its employees' time between lobbying and nonlobbying activities appears to have been arbitrary. Boston Edison's witness testified that some of the time billed to the ratepayers was counted as 100% lobbying time, some as 15% lobbying, some as 12% lobbying, and a considerable amount as 0% lobbying, including all time spent in the office. The witness was unable to explain how one employee could have caused a total of 400 hours spent lobbying to be allocated at 0%. Moreover, he admitted on cross-examination that he had no rule for sorting out these options and no rationale that would support the use of this or any other percentage method of allocation. The Department accepted the allocation nevertheless. It is true, of course, that these employees perform services for the Company other than lobbying, and that the expenses associated with these services may be includable in the cost of service. The record does not suggest an alternative allocation, however. The Company did not prove that these ex-

penses should be borne by its customers, and for this reason the Department's decision to allow $166,547 in contested salaries as an element of the cost of service was erroneous.[24]

The final item challenged by Robinson concerns time spent by Boston Edison employees learning about the November, 1976, public power referendum. The record does not indicate the cost of this activity. Moreover, the Department determined after careful consideration that this expense could fairly be classified as educational rather than political. There was no error.

9. *Alleged miscalculation of the amount of property taxes to be eliminated from the cost of service.* In accordance with its decision to exclude plant held for future use from the rate base,[25] the Department adjusted the Company's test-year property tax expense by subtracting $195,000 in property taxes associated with that plant. The Company contends that only $35,000 should have been subtracted. The Department's decision is fully supported by the record. The Company does not argue this point vigorously, and we are persuaded by the Attorney General's demonstration that the rates already reflect the additional $160,000 sought here.

C. *Ground Rules Established by the Department in 18515 for Boston Edison's Next Rate Case.*

In 18515, the Department ordered "that the Company affirmatively demonstrate, in any future rate case, that it has moved to improve the efficiency of its operations and the productivity of all its employees, both management and nonmanagement. Such a demonstration, at a minimum, would include a showing that employees' wages, salaries, and numbers are not excessive and that the construction program is the least that will provide necessary and adequate service." The Company maintains that it is beyond the power of the Department to impose such a requirement

---

[24] $183,741 (total salaries) minus $17,194 (amount previously disallowed) equals $166,547.

[25] The rate base exclusion is discussed at 21 *supra*.

and that, in any event, this requirement is unfair on its face. There was no error. Under G. L. c. 164, the Department possesses broad investigative and supervisory authority over electric utilities and may properly inquire into these aspects of their operations in furtherance of its mandate to "keep itself informed as to . . . the manner in which they are conducted with reference to the . . . convenience of the public." G. L. c. 164, § 76.[26] It has long been held that "the State, through the regularly constituted authorities, has taken complete control of these corporations so far as is necessary to prevent the abuses of monopoly." *Weld* v. *Gas & Elec. Light Comm'rs*, 197 Mass. 556, 558 (1908). The efficiency of Boston Edison and the magnitude of its construction program are matters of legitimate public interest, and the Company will not be heard to protest at this point that the requirement imposed by the Department constitutes an undue constraint on managerial prerogatives. See *Consumers Power Co.*, 14 P.U.R.4th 1, 14-21 (Mich. Pub. Serv. Comm'n 1976). If the Department administers its requirement unfairly, that issue will, of course, be open to review at the appropriate time.

D. *Intervention in the Proceedings Below.*

The Department permitted Robinson, a mathematician, and one Torgeir Kvale (Kvale), an engineer, to intervene in 18515. Boston Edison maintains that the interests of these individuals were already represented by the Massachusetts Consumers Council, which had intervened "for and in behalf of the people of the commonwealth." G. L. c. 6, § 115, inserted by St. 1963, c. 773, § 2. The Company argues, therefore, that the Department erred in permitting Robinson and Kvale to intervene and also in refusing to limit their

---

[26] See also G. L. c. 164, § 76 (general supervisory and investigative powers); *id.* § 76A (supervision of utility's dealings with affiliates); *id.* § 85 (power to examine company records); *id.* § 93 (power to investigate and adjust prices to order improvement in service); *id.* § 94 (authority to conduct investigation as to propriety of rate increase request). See also *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 494 & n.31 (1973).

participation to filing a written statement of position. The State Administrative Procedure Act grants the Department broad discretion with regard to interveners.[27] However, that discretion is not unlimited. See *Newton* v. *Department of Pub. Utils.*, 339 Mass. 535, 543 n.1 (1959).

Robinson and Kvale both had presented evidence of expertise in ratemaking issues. Both were "interested persons" within the meaning of the statute, and the Department clearly had discretion to allow these individuals to intervene. The more serious question concerns the extent to which Robinson was permitted to participate.[28]

The Department limited Kvale's intervention to making a statement, through an attorney, on one of the several issues about which he had expressed concern. This limited intervention clearly falls within the Department's discretion to allow interested persons "to participate by presentation of argument orally or in writing, or for any other limited purpose, as the agency may order." G. L. c. 30A, § 10, cl. (4), as in effect prior to St. 1977, c. 965. Robinson's participation was an entirely different matter. Of the 4,700 or so pages of transcript in 18515, over 900 pages were taken up by Robinson's cross-examination of witnesses. Another 250 were taken up with the presentation of and cross-examination concerning his direct evidence. We emphasize that he was representing only himself; the Department's regulations prohibit non-lawyers from representing the interests of others.

---

[27] General Laws c. 30A, § 10, inserted by St. 1954, c. 681, § 1, in effect during the departmental proceeding, provided that: "Unless otherwise provided by any law, agencies may . . . (4) allow any person showing that he may be substantially and specifically affected by the proceeding to intervene as a party in the whole or any portion of the proceeding, and allow any other interested person to participate by presentation of argument orally or in writing, or for any other limited purpose, as the agency may order." See St. 1977, c. 965, which struck out § 10 and inserted new provisions governing adjudicatory proceedings.

[28] We do not reach the question whether an individual ratepayer can be a person "substantially and specifically affected by the proceeding" within the meaning of G. L. c. 30A, § 10, cl. (4).

Because of the extent of Robinson's participation, his intervention presents a close question. We cannot agree that the Department was obliged to limit him to the filing of a written statement of position. In most circumstances, Robinson's role would be of doubtful validity. Given the difficulty of the case before it, we cannot say that the Department erred in seeking an intervener's extensive help in fully elucidating the issues. The Department operates under a statutory deadline when conducting rate proceedings, G. L. c. 25, § 18, inserted by St. 1975, c. 684, § 90, and its decision that intervention will expedite the case is entitled to great weight. Our decision in *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667 (1975), relied on by the Company, is not to the contrary. We add that similarly extensive participation by an intervener in any future case should be permitted by the Department only if careful consideration discloses special circumstances in justification.

E. *Rate Structure in 18200/18200-A.*

Once having determined what increase was necessary to meet Boston Edison's revenue deficiency in 18200/18200-A, the Department considered various proposals offered by the Company and the interveners for allocating the increase among the Company's customers. The Department accepted the basic principle underlying the Company's proposed rate structure and fashioned experimental rates allocating the rate increase according to the relative contribution of customer classes to the growth in peak-load demand for electricity.[29] However, the Department modified the Company's proposal by exempting the first 384 KWH of monthly residential usage from the rate increase, on the ground that this segment of residential usage had not contributed significantly to the growth in peak-load demand.

---

[29] General Motors contends that the Department abused its discretion by declining to use as its sole criterion the cost of service to each class. There is no merit to this argument. *Trustees of Clark Univ.* v. *Department of Pub. Utils.*, 372 Mass. 331, 336 (1977). See generally Cudahy & Malko, Electric Peak-Load Pricing: Madison Gas and Beyond, 1976 Wis. L. Rev. 47.

Boston Edison and General Motors challenge this exemption on appeal. They argue that the Department lacked statutory authority to make any exemption at all and that the exemption made is not supported by substantial evidence. In addition, General Motors maintains that the exemption violates its rights under art. 10 of the Declaration of Rights of the Massachusetts Constitution. There was no error.

Under the provisions of G. L. c. 164, § 94, most recently amended by St. 1973, c. 816, §§ 2, 3, the Legislature has given the Department regulatory authority over "all rates, prices and charges" to be collected in the Commonwealth for the sale of electricity. As we have previously noted, this statute gives the Department "jurisdiction of the *entire rate structure*" in electric rate cases. *Boston Real Estate Bd.* v. *Department of Pub. Utils.*, 334 Mass. 477, 485 (1956) (emphasis in the original). The statute contains no exception, but the appellants now submit that the 384 KWH exemption created in 18200/18200-A exceeded the Department's authority. There is no merit to this contention. What Boston Edison and General Motors object to is "different treatment for different classes of customers, reasonably classified," which we have long held to be within the statutory powers of the Department. *Id.* at 495.

This is not a case of irrational discrimination. See *Lefkowitz* v. *Public Serv. Comm'n*, 40 N.Y.2d 1047, 1048 (1976). Cf. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 84 (1976). The Department determined that Boston Edison's need for rate relief stemmed from its construction program; that new construction had been necessitated by the growth in peak-load demand; and that, since average residential usage had not contributed significantly to the growth in peak-load demand, residential users should not participate fully in the rate increase. The Department could reasonably conclude, on the record before it, that the challenged exemption would encourage energy conservation in the public interest, both by residential users below the 384 KWH level and by Boston Edison's largest industrial customers. For this reason, the Depart-

ment's determination must be affirmed if supported by the record. See *Apartment House Council of Metropolitan Wash., Inc.* v. *Public Serv. Comm'n of D.C.*, 332 A.2d 53, 58 (D.C. Ct. App. 1975).

Evidence given by a Boston Edison witness clearly indicates that the Company's increased costs resulted ultimately from the growth in peak-load demand. It also indicates that the "general service class" of commercial and industrial users was primarily responsible for that growth and that residential customers who kept their consumption below 384 KWH monthly contributed least to the need for new plant construction. The 384 KWH figure represents the average residential usage in recent years, and the record shows that this figure has remained relatively steady while commercial and industrial demands have increased. We conclude that there is substantial evidence to support the Department's decision to exempt certain customers.

General Motors points out that the rate structure in 18200/18200-A increases Boston Edison's margin of profit on power sold to industrial customers in order to offset the relatively low margin of profit on power sold to residential ratepayers. It asserts that this price differential amounts to confiscation of its property in violation of the Massachusetts Constitution. This position finds no support in our cases, and there is considerable judicial precedent to the contrary in other jurisdictions. See *Norfolk & W. Ry.* v. *Conley*, 236 U.S. 605, 608-609 (1915); *Minneapolis Gas Co.* v. *Federal Power Comm'n*, 278 F.2d 870, 871 (D.C. Cir. 1960); *Allied Chem. Corp.* v. *Georgia Power Co.*, 236 Ga. 548, 553-554 (1976); *Petrolane Gas Serv., Inc.* v. *Idaho Pub. Utils. Comm'n*, 85 Idaho 593, 602 (1963); *Carpenter* v. *Pennsylvania Pub. Util. Comm'n*, 141 Pa. Super. 447, 450 (1940). We decline to adopt General Motors' argument as the law of the Commonwealth.

## V. Conclusion.

Boston Edison's consolidated appeals raise one additional issue, the Company's claim that it is entitled to damages from the Commonwealth. The Company complains that the Department took an inordinate length of time to implement rate increases in 18200/18200-A and 18515 and that the Commonwealth, therefore, should compensate the Company by the amount of its revenue deficiency in the interim. The Company raises this issue by appeal, and the Attorney General has filed motions to dismiss so much of the appeals as seeks damages from the Commonwealth. Those motions are allowed. Boston Edison should address these arguments to the Legislature. The Department met its statutory deadlines in rate proceedings which it characterized as "perhaps the most complex ever to come before the Department." The record does not support the Company's assertion that the delay was inordinate or intentional.

Judgment is to be entered in the county court affirming the Department's decision in 18200/18200-A. Judgment similarly is to be entered in 18515 affirming the decision in part and reversing as to those subsidiary determinations of the Department found to be erroneous as matter of law, *supra*. These determinations are: (1) the disallowance of an expense adjustment for an estimated Boston property tax increase; (2) the disallowance of an expense adjustment for taxes associated with "AFUDC not normalized"; (3) the disallowance of a contribution made to a citizens' group; and (4) the allowance of an allocated portion of salaries paid to Boston Edison employees engaged, inter alia, in political lobbying, where substantial evidence did not support the allocation. The interlocutory order granting $6,619,000 in interim rate relief is affirmed. If relief could be granted representing the net amount of the several adjustments allowed and disallowed, the Company would be entitled to an amount greater than the $6,619,000 in interim relief already granted. However, it is clear that such additional re-

lief may not be granted, for the reason, as we have stated *supra,* that the more recent decision in 19300 supersedes that in 18515. The law is clear that Boston Edison may not receive additional relief retroactively. See *Arizona Grocery Co.* v. *Atchison, Topeka & Santa Fe Ry.,* 284 U.S. 370, 386 (1932); *New England Tel. & Tel. Co.* v. *Public Utils. Comm'n,* 116 R.I. 356, 388 (1976). The cases are remanded to the county court for the entry of judgment.

*So ordered.*